FILED
CLERK
5/23/2016 4:42 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
STEPHEN BELLONE,

Plaintiff,

-against-

KRAFT POWER CORPORATION,

Defendant.
---------------------------------------------------------X

**ORDER**
15-CV-3168 (SJF)(AYS)

FEUERSTEIN, J.

Plaintiff Stephen Bellone ("Plaintiff" or "Bellone") filed a complaint alleging that he is entitled to recover unpaid overtime wages, liquidated damages, and attorneys' fees from defendant Kraft Power Corporation ("Defendant" or "Kraft"), his former employer, pursuant to the Fair Labor Standard Act of 1938, 29 U.S.C. § 201 *et seq*. ("FLSA"), and the New York State Labor Law, N.Y. Lab. L. § 190 *et seq*. ("NYLL"), on the ground that he was misclassified as an exempt employee. Plaintiff also asserts state law breach of contract and quantum meruit claims against Defendant.[1] Defendant filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 with respect to Plaintiff's FLSA and NYLL claims. For the following reasons, Defendant's motion is granted.

---

[1] *See* Compl. at ¶¶ 42-47, 51-55. Defendant made only a single passing reference to Plaintiff's state law claims and provided no analysis concerning those claims (*see* Memorandum of Law in Support of Summary Judgment (Dkt. 22) at 4), so the Court does not address them here.

## I. BACKGROUND [2]

### A. Plaintiff's Employment and Salary

Kraft is in the business of "design[ing] and manufactur[ing] engine-generator systems."[3] Plaintiff has been involved in the Combined Heat and Power ("CHP") industry since 1994. (Declaration of Stephen Bellone, dated January 11, 2016 ("Bellone Decl.") (Dkt. 24) ¶ 3). As represented in the application for employment that Plaintiff submitted to Kraft in October 2010, his prior positions in the CHP industry included, in chronological order, "President / Owner" at Prime Industrial Energy, "Engineering Director" at Central Hudson Gas & Electric Company, and "Chief Operating Officer – Engineering" at Intelligen Power Systems. (Defendant's Combined Statement of Uncontested Facts Pursuant to Local Rule 56.1, dated February 10, 2016 ("Comb. 56.1 Stmt.") (Dkt. 28) ¶¶ 20-21; Declaration of Christopher Stemper, dated November 16, 2015 ("Stemper Decl.") (Dkt. 21) ¶ 19, Ex. F).

On or about October 18, 2010, Kraft hired Plaintiff as a CHP Technical Manager, who, according to an internal memorandum distributed to all Kraft employees shortly after Plaintiff joined the company, would "be responsible for establishing a CHP … module design and assembly operation, located in a new facility in Brentwood NY [and] also … providing technical assistance for CHP and power generation systems and controls." (Comb. 56.1 Stmt. ¶ 5; Stemper Decl. Ex. A). Kraft's October 15, 2010 offer letter to Plaintiff indicated that Plaintiff's "role with Kraft … will initially be to launch production of 'Kraft Energy Systems' CHP units, to provide technical assistance and service for existing equipment, and assistance with new

---

[2] The relevant facts are taken from the parties' declarations, exhibits, and Local Rule 56.1 statements, and disputes regarding the facts are noted. "In setting forth the facts underlying this [order], [the Court] construe[s] the evidence in the light most favorable to the plaintiff, drawing all reasonable inferences and resolving all ambiguities in [his] favor." *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 601 (2d Cir. 2006) (internal quotations omitted).

[3] *See* http://www.kraftpower.com/our-company/about-us/ (last visited May 23, 2016). The Court relies on Kraft's website because Kraft denies Plaintiff's description of its business activities in its Answer (at ¶¶ 10, 19), and nowhere else does either party offer a description of Kraft's business.

equipment sales." (Stemper Decl. Ex. B). Prior to hiring Plaintiff, Kraft did not design or manufacture CHP module systems. (Comb. 56.1 Stmt. ¶ 7). Plaintiff had more experience designing and assembling CHP modules than any other Kraft employee. (*Id.* ¶ 19).

Plaintiff worked for Kraft as a CHP Technical Manager until his resignation on December 23, 2013. (*Id.* ¶ 143). Plaintiff's starting annual salary was one hundred and ten thousand dollars ($110,000.00). (*Id.* ¶ 15). On or about July 14, 2012, Kraft increased Plaintiff's annual salary to one hundred and fifteen thousand, one hundred and ninety-nine dollars and seventy-six cents ($115,199.76). (*Id.* ¶ 16). On or about July 6, 2013, Kraft increased Plaintiff's annual salary to one hundred and nineteen thousand, eighty dollars ($119,080.00). (*Id.*). As of December 1, 2013, Kraft paid field technicians who worked on CHP equipment and who Kraft did not deem exempt from FLSA overtime requirements between seventeen dollars and eighty cents ($17.80) and thirty-three dollars and seventy-one cents ($33.71) per hour. (*Id.* ¶ 83).

**B. Plaintiff's Participation in Kraft's Personnel Decisions**

1. <u>Joseph Cipriano</u>

When Plaintiff joined Kraft in October 2010, he was the only employee based in the Brentwood, New York facility, which Plaintiff leased through his own company before joining Kraft. (*Id.* ¶¶ 10, 12). On January 24, 2011, Kraft hired Joseph Cipriano as a fabrication assistant in its new Brentwood location. (*Id.* ¶ 41). Cipriano had previously worked with Plaintiff at Intelligen Power Systems and listed Plaintiff as a "friend[ ] or relative[ ]" who works at Kraft on his employment application. (Bellone Decl. ¶ 59; Stemper Decl. Ex. N). Before Cipriano was hired, Plaintiff had discussions with Owen Duffy and Christopher Stemper, Kraft's President and Vice President, respectively, regarding hiring someone to work with Plaintiff at the

Brentwood facility. (Bellone Decl. ¶ 58). Plaintiff told Duffy that he had spoken with Cipriano, that Cipriano, having recovered from an injury, was able to work, and that Cipriano "would like to get back to work and make what he was making at Intelligen." (*Id.* ¶ 59). Plaintiff "called Cipriano and notified him that [Kraft] wanted to hire him." (*Id.* ¶ 60). Plaintiff was listed as Cipriano's manager on Cipriano's "Network User Account Preparation Sheet." (Stemper Decl. Ex. M). When Cipriano resigned from Kraft on May 23, 2013, he notified only Plaintiff. (*Id.* Ex. O; Comb. 56.1 Stmt. ¶¶ 57-58).

2. Ryan O'Gorman

In early August 2011, Plaintiff was falling behind on certain CHP projects and "discussed at length with Stemper that [Plaintiff] needed to get caught up and the only way [he] could do it was with more help." (Bellone Decl. ¶¶ 76-77). Plaintiff "explained [to Stemper] that [he] knew someone ([Ryan] O'Gorman) who worked with [Plaintiff] at Intelligen and that he would probably be willing to work with [Kraft], he already had some experience, and [Kraft] could get him relatively cheap," and "Stemper said, go ahead, see if he's interested." (*Id.* ¶¶ 78-79). After speaking with O'Gorman, who indicated he was interested in joining Kraft, Plaintiff initiated the administrative processes necessary to hire someone, and called O'Gorman to "let [him] know that [Kraft] hired him" as an apprentice in the Brentwood facility. (*Id.* ¶¶ 80-81, 85; Stemper Decl. Ex. P). Plaintiff was listed as O'Gorman's manager on O'Gorman's "Network User Account Preparation Sheet." (Stemper Decl. Ex. P). On September 21, 2011, Plaintiff completed and signed a "Payroll Change Form" indicating that O'Gorman had voluntarily terminated his employment with Kraft effective August 27, 2011 because "[h]e didn't want to work." (*Id*. Ex. Q).

3. Ohio Welding Employee

In September 2012, Kraft planned to hire a new welder for its Ohio facility, and had narrowed down the list of candidates to two (2). (Comb. 56.1 Stmt. ¶ 107; Bellone Decl. ¶ 152). Plaintiff traveled to the Ohio facility, "prepare[d] a welding test" for the candidates, observed both candidates perform the welding test, spoke with both candidates, and offered his opinion regarding the candidates' performance to Kraft's Ohio facility managers. (Comb. 56.1 Stmt. ¶¶ 107-10; Bellone Decl. ¶¶ 152-55). Though Plaintiff now claims to have "liked [the unsuccessful candidate] better … although his welding wasn't as good," Kraft hired the candidate who, in Plaintiff's opinion, based on that candidate's performance on the test that Plaintiff designed, "was a better welder." (Comb. 56.1 Stmt. ¶¶ 110-11; Bellone Decl. ¶¶ 153, 155).

4. Contract Employee for Brentwood Facility Cleanup

In September or October 2013, miscellaneous detritus needed to be removed from a parking lot at the Brentwood facility. (Bellone Decl. ¶¶ 90-91). Plaintiff "spoke to Stemper and told him [Plaintiff] knew a guy that could help … out." (*Id.* ¶ 92). Plaintiff hired this person, paid him, and subsequently sought reimbursement from Kraft. (*Id.* ¶ 93; Stemper Decl. Ex. R).

**C. Plaintiff's Managerial and Administrative Activities**

While employed with Kraft, Plaintiff performed the following functions:

- "After Defendant secured purchase orders, Plaintiff would speak with whoever secured the purchase order to find out what it was that needed to be built and what the specifications were. Plaintiff would then review what the final product would 'look like' with that person before building it." Thereafter, Plaintiff determined which production equipment and tools were necessary to complete a given project, and purchased those tools and equipment using a corporate credit card without seeking pre-approval from anyone else. (Comb. 56.1 Stmt. ¶¶ 29-30, 32-33).

- "[O]n one occasion," Plaintiff conducted a "job walk through with some of the [Kraft] New Jersey technicians that were going to be taking over the routine service and maintenance operations once the CHP system fabrication, installation and commissioning was completed." (*Id.* ¶ 77-78; Bellone Decl. ¶ 119).

- Plaintiff prepared "one line electrical drawings and P&ID (piping and instrumentation diagram) drawings … for … various [Kraft] sales managers." (Bellone Decl. ¶ 130).

- Plaintiff drafted emails to other Kraft employees and/or supervisors containing information regarding the current status of CHP projects and providing instructions and/or information regarding remaining tasks to be completed, which both parties refer to as "task lists." (Comb. 56.1 Stmt. ¶ 87; Stemper Decl. Ex. S; Bellone Decl. ¶ 134).

- Plaintiff, along with other Kraft managerial personnel, received "progress reports" concerning various CHP projects from Kraft technicians. (Comb. 56.1 Stmt. ¶ 88; Stemper Decl. Ex. T; Bellone Decl. ¶ 133).

- Plaintiff trained Kraft's New Jersey technicians to work with a CHP unit at Beth Israel Hospital in Brooklyn. (Comb. 56.1 Stmt. ¶ 102; Stemper Decl. Ex. W).

## II. LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(c)), and "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Belton v. City of New York*, 629 Fed. App'x 50, 50 (2d Cir. 2015) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A district court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty*

*America v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotations omitted).

In order to defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts… [She] must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita*, 475 U.S. at 586-87) (emphasis in original); *see also R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) ("opposing party must provide concrete particulars showing that a trial is needed") (internal quotations omitted). "It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecommunications, Inc. v. W.R. Grace & Company-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

## III. DISCUSSION

### A. The FLSA Overtime Requirement and the "Highly Compensated Employee" Exemption [4]

Generally speaking, the FLSA requires employers to compensate workers at a rate of one and one-half (1.5) times their standard rate of pay for time worked in excess of forty (40) hours per week. *See* 29 U.S.C. § 207(a)(1). The FLSA provides numerous exemptions to the time-and-a-half overtime requirement, one of which is the "highly compensated employees" ("HCE") exemption. 29 C.F.R. § 541.601. To qualify for the HCE exemption, an employee must: (1) have total annual compensation of at least one hundred thousand dollars ($100,000); (2) "customarily and regularly perform[ ] *any one or more* of the exempt duties or responsibilities of

[4] The NYLL mandates overtime pay at the same rate as the FLSA and applies the same exemptions. *See, e.g., Reiseck v. Universal Communications of Miami, Inc.*, 591 F.3d 101, 105 (2d Cir. 2010). For the sake of brevity, the Court addresses Plaintiff's FLSA and NYLL claims together, and references the FLSA alone.

an executive, administrative, or professional employee"[5]; and (3) have a "primary duty [that] *includes* performing office or non-manual work." *Id.* at subsections (a) and (d) (emphasis added).

"A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties… An employee may qualify as a highly compensated executive employee, for example, if the employee customarily and regularly directs the work of two or more other employees, even though the employee does not meet all of the other requirements for the executive exemption under § 541.100." *Id.* at subsection (c). It is undisputed that Plaintiff's annual salary exceeded one hundred thousand dollars ($100,000) for the entire duration of his employment with Kraft. Thus, whether Plaintiff was exempt under the FLSA's HCE provision turns on whether or not he "customarily and regularly" performed at least one of the duties of an executive employee,[6] and whether or not his duties included performing office or non-manual work.

1. Executive Duties

Under the FLSA, an "executive employee" is defined as one who, *inter alia*, (i) "customarily and regularly directs the work of two or more other employees," and (ii) "has the authority to hire or fire employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(3) and (4). Again, an employee who earns more than

[5] "The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701.

[6] Defendant does not assert that Plaintiff customarily and regularly performed the duties of an exempt professional employee. In its reply memorandum, Defendant argued that Plaintiff also customarily and regularly performed the work of an exempt administrative employee. (Dkt. 27 at 7-8). However, the Court need not reach this issue to resolve this motion.

one hundred thousand dollars ($100,000) per year need only fit one of these descriptions to be exempt from overtime requirements under the HCE provision. *See* 29 C.F.R. § 541.601(c).

a. *Directing the work of two (2) or more employees*

At all relevant times, Plaintiff was more experienced than every other Kraft employee with respect to the design and assembly of CHP modules. Whenever a new order for a CHP unit came in, "Plaintiff would speak with whoever secured the purchase order to find out what it was that needed to be built and what the specifications were," and then would determine what tools and equipment were needed to complete the job and would independently purchase the necessary tools and equipment. Plaintiff trained other Kraft employees. Plaintiff drafted synopses of completed work and "task lists" concerning remaining items to be accomplished on CHP projects. Plaintiff received "progress reports" from lower-level Kraft technicians.

The record is clear that Plaintiff did direct the work of other Kraft employees throughout the course of his employment. The record is not clear regarding the frequency with which he directed other employees' work. The FLSA regulations define an "executive employee" as one who, *inter alia,* "*customarily and regularly* directs the work of two or more other employees" (29 C.F.R. § 541.100(a)(3) (emphasis added)), and "customarily and regularly" as "greater than occasional" and/or "normally and recurrently performed every workweek" (29 C.F.R. § 541.701). Because it is not clear from the record that Plaintiff directed the work of two (2) or more Kraft employees with the degree of frequency contemplated by the FLSA regulations, summary judgment in favor of Defendant on this ground is not warranted.

b. *Involvement in hiring activities*

Within Plaintiff's first year of joining the company, Kraft hired two (2) of Plaintiff's former co-workers (Cipriano and O'Gorman) to work alongside Plaintiff at its Brentwood, New

York facility based upon Plaintiff's recommendations. When Cipriano and O'Gorman terminated their employment with Kraft, they notified Plaintiff alone. When Kraft sought to hire a new welder in its Ohio facility, Plaintiff designed and administered a welding test, spoke with both of them, and offered his opinions on which of the two (2) was the more skilled welder and which of the two (2) he "liked better." Kraft hired the candidate who performed better on Plaintiff's welding test. Plaintiff hired a contract worker to assist with clearing debris from the parking lot of Kraft's Brentwood, New York facility. Whether Plaintiff personally or unilaterally hired these individuals, or whether he had the ultimate say regarding who Kraft would hire, is not determinative of his exempt status. *See, e.g., Ramos v. Baldor Specialty Foods,* No. 10-cv-6271, 2011 WL 2565330, *7 (S.D.N.Y. 2011) ("Even if … [exempt employees] did not have firing authority … courts uniformly reject arguments that an employee cannot be an exempt executive if he cannot make hiring or firing decisions … because an employee whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight will also qualify for the executive exemption.") (internal quotations omitted); *Rooney v. Town of Groton,* 577 F. Supp. 2d 513, 530-32 (D. Mass. 2008) ("[T]he regulation does not require that the ultimate decision to hire or promote an employee aligns with the recommendation of the exempt employee. Rather, the regulation requires only that [the exempt employee's] recommendations and suggestions be given 'particular weight.'") (quoting 29 C.F.R. § 541.100).

The record is clear that Plaintiff played an integral role in hiring other Kraft employees and that his input regarding hiring decisions carried weight, thus satisfying one prong of the definition of "executive employee" under 29 C.F.R. § 541.100, which is all that is required to fall within the HCE exemption.

2. Office or Non-Manual Work

"[T]he plain meaning of 29 C.F.R. § 541.601(d) requires only that [Plaintiff's] primary duty consist in part of office or non-manual work, not that their primary duty consist entirely of such work." *Haas v. Verizon New York, Inc.*, No. 13-cv-8130, 2015 WL 5785023, *4 (S.D.N.Y. Sept. 30, 2015). Plaintiff does not address Defendant's argument that his duties at Kraft included some office and/or non-manual work, and the record is clear that they did. As discussed above, Plaintiff's duties included, *inter alia*, (i) evaluating and recommending potential new hires; (ii) speaking with Kraft sales representatives and/or customers to determine product specifications and communicating those specifications to relevant Kraft personnel; (iii) determining which tools and equipment were necessary for a given project and purchasing them; (iv) training other Kraft technicians; (v) preparing drawings and diagrams for Kraft sales managers; and (vi) drafting and distributing synopses of completed work and "task lists" concerning work to be completed to other Kraft personnel. This is "office or non-manual work" within the meaning of 29 C.F.R. § 541.601(d). *See id.* at *6 ("As there is no dispute that Plaintiffs' primary duty *included* answering questions on a checklist and reporting back to the company, whatever else they do, it is difficult to see how their primary duty did not "*include*[ ] performing office or non-manual work.'") (quoting 29 C.F.R. § 541.601(d)) (emphasis in original).

In sum, there is no genuine factual dispute that Plaintiff (i) earned in excess of one hundred thousand dollars ($100,000) per year for the duration of his employment with Kraft, (ii) performed one or more of the duties of an executive employee, and (iii) performed some office and/or non-manual work. Accordingly, Plaintiff was exempt from FLSA and NYLL overtime requirements under the HCE provision.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted. Plaintiff's FLSA and NYLL claims are dismissed. Plaintiff's breach of contract and quantum meruit causes of action remain extant. The parties shall file a proposed scheduling order for the Court's consideration within fourteen (14) days of this Order.

**SO ORDERED.**

*s/ Sandra J. Feuerstein*
Sandra J. Feuerstein
United States District Judge

Dated: May 23, 2016
Central Islip, New York